UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LISA R. LACER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:19 CV 969 DDN |
| ) | |
| ANDREW M. SAUL,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the Court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Lisa R. Lacer for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* and Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge ("ALJ") is reversed and remanded for further proceedings.

## BACKGROUND

Plaintiff Lisa R. Lacer was born on May 10, 1962, and she filed her applications for benefits on June 17, 2016. (Tr. 10, 20, 102-119.) She alleged a disability onset date of April 8, 2015,[2] due to bipolar disorder, osteoarthritis, degenerative disc disease, right shoulder tendonitis, and obesity. (Tr. 12, 371.) Ms. Lacer additionally alleged impairments from a heel spur, sleep apnea, and anal fissures. (Tr. 103.) Plaintiff's application was initially denied on October 5, 2016. (Tr. 142-48.)

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Saul is hereby substituted for Nancy A. Berryhill as Commissioner of Social Security and as the defendant in this action. 42 U.S.C. § 405(g) (last sentence).

[2] Ms. Lacer amended her onset date from December 5, 2011 to April 8, 2015.

On November 8, 2016, plaintiff requested a hearing before an ALJ. (Tr. 149-50.)  On June 19, 2018, the ALJ heard testimony from plaintiff and vocational expert ("VE") Steven H. Kuhn. (Tr. 10-66).  On October 3, 2018, the ALJ found that plaintiff was not disabled. (Tr. 20.) On March 3, 2019, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.)  Thus, the decision of the ALJ is the final decision of the Commissioner.

## MEDICAL HISTORY

The following is a summary of plaintiff's medical history relevant to this appeal. Plaintiff was initially diagnosed with bipolar disorder in 2009. (Tr. 37.)  She takes medication and receives counseling for bipolar disorder.

On April 3, 2015, plaintiff saw Faye Cohen, M.D. for evaluation of her joint pain and fatigue. (Tr. 488.)  At that time, plaintiff reported joint pain for the previous three years. (*Id*.) She was taking Relafen to help with the pain, but she now takes ibuprofen two or three times a day. (*Id*.)  Dr. Cohen found no synovitis on any joints. (*Id*. at 490.)  The doctor further found plaintiff had good range of motion of all joints.  However, with external rotation of her right hip, plaintiff felt some pain in her left sacroiliac joint area and minimal tenderness over both SI joint regions. (*Id*.)  Plaintiff felt tenderness when palpated over her bunions and had a little bit of fullness or fat pad over both of her prominent inner ankle bones.  (*Id*.)  Dr. Cohen noted her ankles, however, appeared without any fullness or edema and were clear and had good range of motion as did her shoulders, elbows, wrists, and hand joints. (*Id*.)  Plaintiff had an early Heberden's node (a sign of osteoarthritis in a right hand fingertip.  (*Id*.)  Dr. Cohen reported plaintiff had trigger points over her shoulder muscles and over her knee that were significant. (*Id*.)  Dr. Cohen diagnosed plaintiff with arthralgia, fatigue, and low back pain. (Tr. 486-501.)

On April 8, 2015, Dr. Cohen ordered a series of x-rays of her lumbar spine, which indicated mild narrowing of L5-S1 disc space and minimal endplate change. (Tr. 495-501.)  The x-ray depicted osteoarthritic change in the SI joints. (*Id*.)  An x-ray of the right heel indicated a plantar calcaneal spur. (*Id*.)  X-rays of the right and left hands indicated osteoarthritic changes, while an x-ray of the left foot indicated no abnormality. (*Id*.)

On September 10, 2016, plaintiff was evaluated by consultant David Simckes, M.D.  (Tr. 620.)  Dr. Simckes noted plaintiff had a waddling gait and a wide base stance, but she did not require or use an assistive device. (*Id*.)  Dr. Simckes found her hand-eye coordination was

normal with and without visual cues. (*Id*. at 630.) Plaintiff's muscle bulk and tone were within the normal range and the Romberg's Test was negative, indicating healthy functioning of the dorsal columns of the spinal cord and stable motor coordination. *See* Romberg Test, PHYSIOPEDIA, https://www.physio-pedia.com/Romberg_Test. Dr. Simckes found plaintiff's deltoids, biceps, triceps, and wrists were normal, as were her bilateral finger spread and grip. (*Id*. at 630.) Dr. Simckes determined plaintiff's back, hip flexion, extension, abduction, adduction, leg extension, flexion, ankle dorsiflexion, and plantar flexion were all normal. (*Id*.) While there were some Herberden's nodes in both hands in the proximal joints, the joints of the elbows, shoulders, neck, spine, hips, knees, ankles, and feet showed no ankyloses, deformities, swelling, or laxity. (Tr. 618-31.)

While Dr. Simckes could not completely evaluate plaintiff's bipolar disorder and its effects on her work, he believed she could sit twenty minutes, stand twenty minutes, walk two hundred feet before resting, and lift and carry twenty pounds. (*Id*. at 631.) Dr. Simckes further found plaintiff could reach, handle, finger, kneel briefly, balance, climb one flight of stairs, see, speak, and could tolerate heat, cold, and vibrations without any difficulty. (*Id*.)

On September 28, 2016, plaintiff saw Bryce Gray, Psy.D. for a consultative psychological examination. (Tr. 632-37.) Dr. Gray discerned plaintiff was capable of functioning satisfactorily on a daily basis. *(Id*.) He found that she had difficulty interacting socially with strangers but was able to interact around people with whom she was familiar. (*Id*.) Plaintiff stated she had difficulty adapting to change. During the mental status portion of the exam, plaintiff had no difficulty completing a three-step instruction. (*Id*.) Dr. Gray stated plaintiff was capable of effectively understanding and comprehending more complex directions. (*Id*.) Dr. Gray found plaintiff appeared to have minimal problems sustaining attention and remaining on task. (*Id*.) Dr. Gray also noted that, while plaintiff could recall three unrelated words immediately, she could only recall one out of the three following a brief delay, indicating poor short-term memory. (*Id*.)

Plaintiff denied being hospitalized due to mental illness, although she receives outpatient services for medications through a psychiatrist. (Tr. 635.) She previously attended therapy but no longer attends. (*Id*.) Plaintiff takes Lexapro in the winter due to depression. (*Id*.) She has been taking her current regimen for the past three to four years, although plaintiff contends her

3

bipolar symptoms persist. (*Id.*)  Dr. Gray diagnosed plaintiff with bipolar-II disorder, depression with a seasonal pattern, and generalized anxiety disorder with panic attacks. (Tr. 637.)

Plaintiff reported that on a typical day, she wakes up at 5:00 a.m. with her husband to help him get ready for work. (Tr. 635.)  Once awake, she does her daily hygiene and showers daily. (*Id.*)  She then makes coffee and breakfast. (*Id.*)  Plaintiff admitted she was capable of doing household chores but needs her husband's assistance for certain tasks, such as doing heavy loads of laundry, due to her physical limitations. (*Id.*)  Plaintiff is also able to cook and operate the stove. (*Id.*)  Her day typically involves watching television and checking her email throughout the day. (*Id.*)  Plaintiff goes to bed between 11:00 and 11:30 p.m. (*Id.*)

On October 5, 2016, Elisa Lewis, Ph.D., provided a psychiatric review of plaintiff's medical records. (Tr. 111.)  She opined plaintiff would have moderate limitations with her activities of daily living, maintaining social functioning, and her abilities to maintain concentration, persistence, and pace. (Tr. 102-19.)  Dr. Lewis considered plaintiff's relevant medical history and found that while plaintiff's diagnoses "could reasonably be expected to produce the alleged symptoms, . . . the intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence." (Tr. 112.)  Plaintiff still possesses the ability to focus, remember, and carry out a wide range of work, even while considering plaintiff's limitations regarding intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, and being in close proximity to coworkers and the public. (Tr. 117.)

On December 30, 2016, plaintiff saw Jamie Haas, M.D., for consultation regarding her Continuous Positive Airway Pressure ("CPAP").  Plaintiff began using CPAP equipment in 2011 to assist with sleeping. (Tr. 686.)  Dr. Hass reported plaintiff was doing well overall.  She no longer snores and no longer has restless legs at night. (*Id.*)  Additionally, plaintiff reports she is regularly able to sleep through the entire night. (*Id.*)  Plaintiff does not doze during the day and is comfortable driving. (*Id.*)

On August 3, 2017, plaintiff saw John Powell, M.D. for a follow-up examination of her right shoulder tendonitis. (Tr. 765.)  Dr. Powell concluded plaintiff's range of motion was within normal limits, although she reported pain during internal rotation. (Tr. 767.)  Plaintiff's rotator cuff strength was normal, although x-rays depicted some degenerative changes at the glenohumeral joint. (*Id.*)  Plaintiff would not consider Dr. Powell's suggestion to receive an MRI scan or surgery.  Instead, she preferred another shot of cortisone. (*Id.*)

4

On June 20, 2017, Howard Ilivicky, M.D., completed a mental medical source statement regarding plaintiff.  He had not seen plaintiff since December 1, 2016. (Tr. 610-11.)  In that report, Dr. Ilivicky provided a checklist of symptoms plaintiff possessed, without further explanation corresponding with the degrees of severity he deduced. (Tr. 638.)  Similarly, on August 4, 2016, Dr. Ilivicky completed an evaluation of plaintiff although he had not seen her since April 2016.  In that report, Dr. Ilivicky found that plaintiff suffers from severe mood swings with extreme highs and lows.  He opined plaintiff does not easily get along with others and runs away from difficult situations.  Further, plaintiff has impaired concentration and she is unable to maintain work pace or persistence. (Tr. 610-11.)

## **ALJ HEARING**

On June 19, 2018, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 34-66.)   Her bipolar disorder involves extreme lows making it difficult to interact with people and to even get out of bed some days. (Tr. 46-47.)  Plaintiff has been diagnosed with bipolar disorder since 2009. (Tr. 37.)  She contends she suffers from severe bouts of depression a couple times a month along with crying spells that require her to leave what she is doing to be alone. (Tr. 49.)  Plaintiff suffers from panic attacks that last anywhere between 30 to 60 minutes, once or twice a week. (Tr. 51.)  She reports difficulty sleeping due to racing thoughts.  Plaintiff complained of arthritis in her hands, feet, and back, which requires her to sit and apply ice. (Tr. 37.)

Plaintiff reports she sees Dr. Ilivicky for medication management and counseling when needed. (Tr. 38.)  She currently takes Lamictal as a mood stabilizer, Ambien for sleep, and Klonopin as needed for anxiety.  (Tr. 46.)

Plaintiff does not have any difficulty caring for her personal needs such as dressing herself, feeding herself, bathing, washing her hair, combing her hair, and tying her shoes. Plaintiff denies relying on a stick, cane, or crutch for movement but uses her husband's hand when needing extra support when walking on uneven or rocky surfaces and when climbing stairs. (Tr. 42.)

Plaintiff utilizes a brace with Velcro straps and laces for her ankle when it is painful. She also has a boot that she can use on either foot.  Plaintiff also has custom orthotics for support. (Tr. 43.)

5

At the hearing, plaintiff testified she wakes up around 9:00 a.m. and goes to bed around midnight. When she goes grocery shopping, she sometimes needs assistance from her husband because she forgets things, or if she is in her manic phase, she will spend too much money. (Tr. 44-45.) She has difficulty carrying a gallon of milk because of the arthritis in her hands and her poor grip. (Tr. 52.) She has difficulty typing. (*Id.*) For the arthritis in her hands and feet, plaintiff takes ibuprofen and uses Biofreeze to ease the pain. (Tr. 52.) She also uses ice or heat on painful parts of her body two to three times a week. (Tr. 53.)

Plaintiff reports a lack of ability to stay on task and concentrate. When her husband asks her to do something during the day, she forgets. She uses her phone alarm to alert her to do something; written instructions don't suffice alone. Even with the timer set, she might still forget to do something, because she turns the timer off and gets distracted. (Tr. 50-51.)

Plaintiff's last job was as a paraprofessional with the Wentzville School District, working thirty-five hours a week. In that position, she worked in special education classrooms and took students from class to class. She also took notes for some students, read their tests aloud, or even scribed answers when a student was unable to write. (Tr. 54-55.) Plaintiff was required to lift certain students, but after she injured her back, that was no longer a requirement. (Tr. 57-58.) This employment required no specialized training, beyond a high school degree. She left that job after becoming severely depressed following her father's death. (Tr. 54-55.)

Plaintiff also worked for Medical Transportation Management, where she took calls from people with Medicaid or Medicare who needed rides to doctors' appointments. Plaintiff coordinated the trips with transportation companies. (Tr. 55-56.) Prior to working at Wentzville School District and Medical Transportation Agency, plaintiff worked for Embarq Missouri, Incorporated.[3] (Tr. 56-57.)

During the hearing, the ALJ posed a hypothetical question to the VE, asking whether an individual with plaintiff's age, education, and work experience could return to work assuming that the person could carry 20 pounds on occasion and 10 pounds frequently, could stand and/or walk about six of the eight hours and could sit about six out of the eight. (Tr. 58-61.) The ALJ further limited the hypothetical to a person who could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (*Id.*) The VE was also asked to assume that the individual would not be able to climb ladders, ropes, or scaffolds, and would not be able to work around

---

[3] Embarq Missouri, Inc. is also known as Sprint.

6

dangerous machinery. (*Id*.)  Further, the hypothetical individual would also have to avoid jobs that involved whole body vibration such as operating heavy equipment. (*Id*.)  In addition, the individual should avoid walking on uneven surfaces, such on open fields and construction sites, and would have to avoid working with the right arm above shoulder level. (*Id*.)  The person should be limited to frequent use of both upper extremities for fine and gross manipulation. (*Id*.)  Considering all these limitations, the VE found plaintiff could perform her previous work as a paraprofessional, dispatcher, or general clerk. (*Id*.)

When the ALJ limited the exertion level to sedentary work, plaintiff could perform work as a dispatcher. (Tr. 62)  When the ALJ asked if there would be any transferable skills from plaintiff's light work as a paraprofessional, the VE found that the transferable skills were clerical in nature and would be covered by other work she performed already as a dispatcher or general clerk. (*Id*.)

The ALJ additionally limited the hypothetical person to simple and/or repetitive work that did not require interaction with the public or close interaction with coworkers. (Tr. 62-63.)  The VE determined this would preclude all past relevant work. (*Id*.)  However, the VE determined the individual would still be able to perform work as a production assembler, a packager, and a general office clerk. (*Id*.)

The ALJ adjusted the hypothetical to involve an individual who would consistently miss two or more days a month. (Tr. 63-64.)  The VE discerned that that would preclude competitive employment in those types of jobs after a brief period. (*Id*.)  Next, the ALJ inquired about a hypothetical individual who would not miss work but due to some medical condition would have to arrive late to work or leave work early or step away from the work setting at least the equivalent of an additional break time, but it would occur randomly, never predictably during the week and at least once every week.  The VE voiced that this would preclude competitive employment in the past work or other competitive employment. (*Id*.)

The ALJ described another hypothetical where the individual appeared at work every day and remained at the workstation but due to some medical condition would be consistently off task during the day.  The ALJ inquired about what percentage of consistent off-task behavior would preclude competitive employment.  The VE responded that approximately 15% of the workday being off-task would preclude competitive employment. (Tr. 64.)

The ALJ's final hypothetical involved removing the limitations to simple or repetitive involvement with the public and coworkers, a light work hypothetical, with the addition that the individual would be limited to only occasional use of the upper extremities for fine and gross manipulation.  The VE found that this hypothetical would still eliminate past work or other work.

At the conclusion of the hearing, plaintiff's attorney noted that plaintiff is approaching the date where she would be eligible to switch age groups for considering benefits.

### **DECISION OF THE ALJ**

On October 3, 2018, the ALJ issued a decision that plaintiff was not disabled between April 8, 2015, and the date she was last insured, December 31, 2016. (Tr. 10-20.)  At Step One of the prescribed regulatory decision-making scheme, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 8, 2015.  At Step Two, the ALJ found that plaintiff suffers from the following severe impairments supported by medically accepted evidence: bipolar disorder, osteoarthritis, degenerative disc disease, right shoulder tendonitis, and obesity.  (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or medically equalled the severity of one of the listed presumptively disabling impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 12.)  The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b), except that she could only occasionally climb ramps and stairs, only occasionally stoop, kneel, couch, and crawl. (Tr. 14.)  Plaintiff should avoid ladders, ropes, or scaffolds, working at unprotected heights, and working around dangerous machinery.  Plaintiff should avoid jobs exposing her to whole-body vibrations, jobs requiring walking on unimproved ground, and should avoid working above shoulder level with her right arm and hand. (*Id.*)  Plaintiff should be limited to no more than frequent, non-repetitive use of her arms and hands for fine and gross manipulation.  (*Id.*)  Plaintiff was further limited to simple and repetitive jobs that did not require close interaction with the public or coworkers. (*Id.*)  At Step Four, the ALJ found that plaintiff was unable to perform any past relevant work through the date she was last insured.  (Tr. 18.)

At Step Five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that plaintiff

8

could have performed through the date last insured. Accordingly, the ALJ found that plaintiff was not disabled at any time from the alleged onset date through the date last insured. (Tr. 19.)

## GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Id*. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

## DISCUSSION

Plaintiff argues that the ALJ: (1) failed to give adequate weight to plaintiff's treating physician and (2) erred in mechanically applying the age criteria of the Medical-Vocational Guidelines, because plaintiff was within five months of turning age 55 when she was last insured.

### A. Evaluation of the Medical Opinions

Plaintiff argues the ALJ improperly discounted the opinions of her treating mental health professional, who found she had substantial mental limitations, and the ALJ improperly ignored the opinions of her treating physician, citing the lack of specific supportive findings. Plaintiff

9

argues this contravenes the ALJ's duty to consider all evidence, including evidence that might detract from an ALJ's conclusion.

The ALJ properly considered the extent of plaintiff's mental limitations and did not err in discounting the opinion of the treating physician.  A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p.  While a treating physician's opinion is typically given controlling weight, it is not inherently entitled to it. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  If a treating physician's opinion is not supported by diagnoses based on objective evidence or is inconsistent with the physician's treatment notes or the record as a whole, the ALJ may lawfully discount it. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003*). See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (ALJ may discount a physician's opinion if the opinion is internally inconsistent).

Here, the ALJ determined that there was no evidence in the record that plaintiff possesses ailments significant enough to preclude her from sustained competitive employment. Further, none of plaintiff's treating physicians recommended she not seek employment. (Tr. 17.)

The ALJ considered treatment reports from Dr. Cohen, who saw plaintiff in April, 2015. Dr. Cohen noted plaintiff had good range of motion but that she felt tenderness in response to palpation on her bunions.  Her ankles, which appeared without fullness or edema, had good range of motion, as did her hands, shoulders, wrists, and elbows.  An x-ray of plaintiff's lumbar spine indicated mild narrowing of the L5-S1 disc space and minimal endplate change.  X-rays of the SI joint and hands showed some osteoarthritic changes as well.  While plaintiff's right foot had a plantar calcaneal spur, her left foot had no abnormality. (Tr. 17, 486-501.)  The ALJ found these medical findings inconsistent with the record and the severity of pain alleged by plaintiff.

The ALJ also considered reports from Dr. David Simckes, who conducted a consultative examination in September 2016.  Dr. Simckes' examination produced numerous unremarkable findings that directly conflict with findings for disabling functional limitations, despite not being able to evaluate plaintiff's bipolar disorder. (Tr. 15-17, 623-31.)   Dr. Simckes determined plaintiff could lift 20 pounds, sit 20 minutes, stand 20 minutes, and walk 200 feet before resting. (Tr. 16, 631.)  He also found plaintiff could reach, handle, finger, kneel briefly, crawl briefly,

balance, climb one flight of stairs, see, speak, and tolerate heat, cold, and vibrations without difficulty. (Tr. 16, 631.)  The ALJ incorporated Dr. Simckes credible and substantiated findings into the RFC. (Tr. 14.)

The ALJ considered three different medical opinions addressing plaintiff's mental health condition. (Tr. 13, 16-18.)  Dr. Lewis, a State agency psychologist who reviewed plaintiff's medical evidence contained in the record, found that plaintiff had limitations with her activities of daily living, maintaining social functioning, and her abilities to maintain concentration, persistence and pace would all be considered moderate. (Tr. 17, 110-11,115-17.)  Another psychologist, Dr. Gray, evaluated plaintiff in September 2016 and reached similar conclusions, finding plaintiff was capable of functioning satisfactorily on a daily basis.  He determined plaintiff could interact with people she knew, understand and remember complex instructions, sustain attention, and remain on task (Tr. 13, 16, 18, 637.)  The ALJ applied these findings to plaintiff's RFC, finding the reports credible and substantiated. (Tr. 14, 18.)

Finally, the ALJ considered the medical records from Dr. Ilivicky, plaintiff's psychologist since 2009.  Dr. Ilivicky submitted a mental medical source statement from June 20, 2017.  However, Dr. Ilivicky had not seen plaintiff since December 2016. (Tr. 16-17, 638-43.)  Further, the ALJ determined the note contained much more severe functional mental limitations than those supported by the treatment records. (Tr. 16-17.)  The severe functional limitations cited by Dr. Ilivicky were contradictory to the other psychiatrists' findings, were not supported by Dr. Ilivicky's treatment notes, and were not supported by the remainder of the medical records. (Tr. 16-17, 638-43.)  The ALJ considered Dr. Ilivicky's medical records in the decision but decided not to give them substantial weight due to their conflicting nature. (Tr. 17.)

The form completed by Dr. Ilivicky was a checklist, with almost no opportunity to comment beyond the binary yes/no or other check-the-box formatted information. (Tr. 638-43.)  Generally, such checklist forms are given limited value in determining an RFC.  While a checklist can be a source of objective medical evidence, courts have held they should be discounted when "'the limitations listed on the form stand alone, and were never mentioned in the physician's numerous records o[f] treatment nor supported by any objective testing or reasoning.'" *Cline v. Colvin*, 771 F.3d 1098,1104 (8th Cir. 2014).  The Eighth Circuit has stated that a conclusory checkbox form has "little evidentiary value when it cites no medical evidence, and provides little to no elaboration." *Anderson*, 696 F.3d at 794.  Dr. Ilivcky's check-box form

11

contains little explanation or elaboration on the conclusions checked off. (Tr. 638-43.) Similarly, in *Hogan v. Apfel*, the Eighth Circuit held that the ALJ properly discounted the physician's medical source statement because it contained limitations that "stand alone," did not exist in the physician's treating notes, and were not corroborated through objective medical testing. 239 F.3d 958, 961 (8th Cir. 2001). Here, Dr. Ilivicky's notes includes changing dosages to address plaintiff's needs, but provides no medical support for an inability to work other than the checked boxes.  (Tr. 394-407, 432-33, 434-37, 608-17, 638-52, 774-77.)   Dr. Ilivicky checked boxes to indicate that plaintiff had marked difficulties in maintaining social functioning and that she demonstrated fair to worse aptitudes for unskilled work in several different listed categories. (Tr. 16, 640-41.)  However, the ALJ determined these findings were inconsistent with the record as a whole, including Dr. Ilivicky's own treatment notes. (Tr. 16-17.)

Furthermore, checkmarks on a form "are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record."  *Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011). The conclusory nature of the checkbox form used include findings such as "either continuous or intermittent difficulty . . . holding a job." (Tr. 642.) This specific finding is not a medical finding, but instead is a vocational assessment which belongs to Commissioner of Social Security. 20 C.F.R.  § 404.1527(d) (opinion on ultimate issue of disability is a medical opinion and is not entitled to any special significance); *see also House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).

An "ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).  Thus, the ALJ may consequently discredit a conclusory opinion, even from a treating physician, if that opinion is unsupported by the medical record.

### B. The Medical-Vocational Guidelines Age Criteria.

Plaintiff argues that the ALJ applied the age-criteria mechanically and as a result improperly applied an earlier age bracket when considering plaintiff's RFC. The Court agrees.

On the date last insured, plaintiff was 54 years old. (Tr. 36.)  Under the Guidelines, three age categories are identified: a younger person (under age 50), a person closely approaching

advanced age (ages 50–54), and a person of advanced age (age 55 or older). 20 C.F.R. § 404.963(c)-(e). Although the Commissioner is directed to use each of the age categories which apply to a claimant during the period for which the Commissioner must determine disability, the age categories are not to be applied mechanically in a "borderline situation." 20 C.F.R. § 416.963(b); *Woods v. Saul*, No. 4:18 CV 1431 CDP, 2019 WL 4169356, at *3 (E.D. Mo. Sept. 3, 2019). Instead, if plaintiff is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [plaintiff is] disabled, [the agency] will consider whether to use the older age category after evaluating the overall impact of all the factors of [plaintiff's] case." *Id.*

Courts have adopted a "sliding scale" approach to determine whether to apply the chronological age at the date last insured or the older age whereby plaintiff "must show progressively more additional vocational adversity(ies)—to support use of the higher age—as the time period between the [plaintiff's] actual age and . . . her attainment of the next higher age category lengthens." *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012); Application of the Medical–Vocational Guidelines in Borderline Age Situations, Soc. Sec. Admin., Office of Hearings and Appeals, *Hearings, Appeals, and Litigation Law Manual* (HALLEX) II–5–3–2, http://www.socialsecurity.gov/OP_Home/hallex/II–05/II–5–3–2.html. While the Eighth Circuit does not have a brightline rule for what constitutes a borderline situation, courts have recognized a six-month range marking consideration for a borderline age situation. *Phillips v. Astrue,* 671 F.3d 699, 703 (8th Cir. 2012) (finding plaintiff's four month time period to the next age category constituted a borderline situation); *see Lewis v. Comm'r of Soc. Sec.,* 666 F.Supp.2d 730, 738 (E.D. Mich. 2009) ("[g]enerally, courts hold that a person within six months of the next higher age category is considered 'borderline.'"); *Gallagher v. Astrue,* No. 08–cv–163–PB, 2009 WL 929923, at *6 (D.N.H. April 3, 2009) ("[a]lthough the courts have varied in their interpretation of in what period of time the borderline range falls, the general consensus is that the borderline range falls somewhere around six months from the older age category.").

For this Court to affirm the ALJ's decision there must be substantial evidence to support it. "In a case in which the claimant's age indicates that he or she might well fall within a borderline age category, the ALJ's failure to note that the ALJ has considered whether a claimant falls within a borderline category and, if so, whether bumping up the claimant up is warranted, constitutes a failure to offer findings of fact and reasons for the decision." *Phillips v. Astrue*, 671

13

F.3d. at 707. An indication the ALJ was aware of the borderline situation when reaching a determination is all that is needed. *Id*. at 706*; see also Van Der Maas v. Comm'r of Soc. Sec*., 198 Fed.Appx. 521, 527 (6th Cir. 2006) ("The ALJ . . . determined that 'it is not appropriate to consider the claimant to be an individual of advanced age on her date last insured for benefits.'").

If a borderline age category exists, it is the ALJ's duty to consider the effects of the higher age instead of the chronological age. *Woods*, 2019 WL 4169356, at *3. In which case, the guidelines should not be applied mechanically. *Id*. In the instant case, plaintiff was 54 years old at the time she was last insured; only five months remained before her fifty-fifth birthday and the age category of "advanced age." (Doc. 17 at 1). Being considered a borderline situation does not automatically place plaintiff in the higher age category. However, when the age category does change prior to the decision, the older age category must be applied.[4]

In plaintiff's case, she reached the age of fifty-five at the time of the ALJ's decision, which was further recognized by the ALJ when he identified her age change in age category in his decision. (Tr. 20). Thus, plaintiff established herself as "advanced age." 20 C.F.R. § 404.963(c)-(e). A borderline situation analysis need not apply when plaintiff had surpassed the minimum age for that age category.

Here, because plaintiff reached advanced age, the ALJ is required to address skill transferability before determining disability.

> If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to *other skilled or semiskilled work* (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s).

---

[4] "Age of a Social Security disability claimant is determined at the date of the decision, not the date of the application or the date of the administrative hearing." 20 C.F.R. § 404.963(b); 154 A.L.R. Fed. 625 (Originally published in 1999); Age to be used, 3 Soc. Sec. Law & Prac. § 43:149 ("[I]t has been found that a claimant's age as of the time of decision governs."); *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 18 Soc. Sec. Rep. Serv. 52, Unempl. Ins. Rep. (CCH) ¶ 17370 (6th Cir. 1987); *Hurter v. Astrue*, 465 Fed. Appx. 648 (9th Cir. 2012); *Daniels v. Astrue*, 854 F. Supp. 2d 513 (N.D. Ill. 2012); *Justice v. Astrue*, 576 F. Supp. 2d 195 (D. Mass. 2008), subsequent determination, 589 F. Supp. 2d 110, 139 Soc. Sec. Rep. Serv. 46 (D. Mass. 2008); *Russell v. Commissioner of Social Sec.*, 20 F. Supp. 2d 1133, 58 Soc. Sec. Rep. Serv. 805, Unempl. Ins. Rep. (CCH) ¶ 16131B (W.D. Mich. 1998).

20 C.F.R. §§ 404.1568(d)(4), 416.968(d)(4); SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000) ("Evidence from a VE . . . cannot be inconsistent with SSA policy on transferability of skills," including that "an individual cannot transfer skills to unskilled work."); ECF No. 18 at 7.

Even if plaintiff's paraprofessional or dispatcher skills were transferable, they could not transfer to an unskilled job, such as the production assembler, packager, or general office clerk cited by the ALJ at step five. (Tr. 20.)  Because dispatcher and paraprofessional are classified as semi-skilled occupations (Tr. 59), the transfer of those skills cannot be to an unskilled job without a finding of disabled.[5]  *Remelius v. Saul,* No. 4:18-CV-01105-AGF, 2019 WL 4141034, at *9 (E.D. Mo. Aug. 30, 2019).

Here, the ALJ's holding to the contrary is undisputedly erroneous as he not only determined transferability of skills as not material, but he also failed to address the lack of support of transferable skills to a skilled or semi-skilled position. (Tr. 19.) ("The undersigned notes that the claimant's age category has changed since her alleged onset date and the date of this decision. However, the change in age category and subsequent change in the applicable Grid Rule does not change the finding that the claimant is not disabled.")  The VE did in fact address the transferability of skills but found that they would be clerical in nature and appropriate for unskilled positions. (Tr. 62-63.)  As a result, the ALJ's determination of not disabled does not meet the established SSA policies and the decision must be remanded for further consideration of plaintiff's advanced age category.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner is remanded for further proceedings that consider plaintiff's advanced age category.  An appropriate Judgment Order is issued herewith.



      /s/   David D. Noce      
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 15, 2020.

---

[5] "Unskilled work corresponds to an SVP of 1 to 2; semiskilled work corresponds to an SVP of 3 to 4; and skilled work corresponds to an SVP of 5 to 9; Skills can be transferred only to work with an equal or lower SVP level (but skills cannot transfer to jobs having SVPs of 1 or 2)". Vocational expert (VE), 1 Social Security Claims and Procedures § 8:95 (6th Ed.)